**ROCHESTER EDUCATION ASSOCIA-
TION, et al., Appellants,**

v.

**INDEPENDENT SCHOOL DISTRICT
NO. 535, a/k/a Rochester Public
Schools, Respondent.**

Nos. 47704, 47607.

Supreme Court of Minnesota.

Oct. 13, 1978.

Oppenheimer, Wolff, Foster, Shepard & Donnelly and Craig W. Gagnon and Thomas Anderson, St. Paul, for appellants.

Schacht & Kerr, Rochester, for respondent.

Heard before KELLY, SCOTT and WAHL, JJ., and considered and decided by the court en banc.

WAHL, Justice.

The Rochester Education Association, as exclusive bargaining representative for teachers in Independent School District No. 535, 8 individual plaintiff-appellant teach-

ers, and a class[1] of approximately 210 similarly situated teachers having 11-month teaching contracts appeal from a judgment of the Olmsted County District Court declaring that these plaintiffs in their employment contract with defendant-respondent School District do not have continuing contract rights under Minn.St. 125.12 with respect to the eleventh month of service.

The appeal raises two issues: (1) whether the "continuing contract" protections of Minn.St. 125.12, et seq., apply to the eleventh month of an 11-month teaching contract; and (2) whether annual salary review worksheets which incorporate biennial master contracts satisfy the "written contract" requirement of Minn.St. 125.12, subd. 2.

After a bench trial, the district court held, in a carefully considered opinion but without the benefit of a prior decision on the issue by this court, that continuing contract rights were applicable only to the "normal," statutory school year.[2] The trial court thus approved the School District's unilateral action decreasing the base salary of each of the appellants by nearly 10 percent and reducing the length of their duty assignments from 11 months to 10 months per year without complying with the procedural requirements of Minn.St. 125.12. The trial court also approved the annual contract procedure used by the School District.

We reverse in part and affirm in part.

Since 1946, the School District has selectively offered teaching contracts of 10-month or 11-month duration. Ten-month contract teachers were obligated for 200 total employment days and might be employed, as needed, for an eleventh month on a temporary, year-to-year basis. The 11-month contracts, on the other hand, offered to approximately 20 percent of the staff, were extended to the most capable and experienced teachers and were used primarily to staff the District's summer programs. It is clear from the record that the 11-

month contracts were used to attract desirable teachers to the District and as an incentive to the teaching staff. The trial court found that the 11-month teachers were required by their contracts to render 220 professional duty days "at such assignment as was directed by the district." Eleventh month assignments varied. Until 1956, the summer program included recreational activities. Summer travel with pay and teaching continuing education with pay were eliminated in 1973. However, since 1956, education assignments have predominated, either as continuations of preceding counseling or therapy assignments or new classroom teaching assignments in other areas of certification or participation in curriculum development workshops.

When originally employed within the School District, the teachers were offered contracts of employment, called "Teachers' Contracts," which specified an annual wage and general assignment, signed by the clerk, chairman of the Board of Education, and teacher. From 1946 through 1971, subsequent contract renewals were accomplished by contract revision sheets and, after 1972, by salary worksheets based on master contracts negotiated by the Board and the teachers' exclusive bargaining agent. The initial contracts, the contract revisions, and the salary worksheets all separated "contract length" provisions from "extra duty" (e. g., coaching, department chairman, etc.) assignments and indicated a "basic salary" based on contract length and distinguished from "extra duty pay."

On January 4, 1972, the District's Board of Education announced by resolution that:
"* * * the Board of Education does not consider the eleven-month program as a contractual relationship under the Teacher Tenure Law. It is the opinion and determination of the Board of Education that teachers teaching in the eleven

1. The class was duly certified pursuant to Rule 23.03, Rules of Civil Procedure, without opposition by the School District.

2. Minn.St. 124.19 requires that a normal school year shall not be less than 175 days in order to

entitle the school to state aid. Minn.St. 126.12 provides that schools shall be in session for not less than a minimum term, as defined by the state board of education.

month program are teaching under the normal school contract with additional special assignments in [the] summer program. Each teacher now serving in the program shall be retained in the program so long as said teacher's participation in the program will serve the best interest of the school; * * * "

The teachers refused to sign the modified renewal forms. After negotiation, the teachers and the School District adopted a memorandum agreement that no "continuing contract" claims would be waived by renewal. On March 16, 1976, the Board of Education, after evaluating a study of the financial requirements essential for its educational offerings, unilaterally adopted a resolution which, as of summer, 1977, terminated the summer school program, reduced the working assignment of teachers in the 11-month program to 10 months, reduced the compensation of those teachers by one-eleventh, and triggered the present controversy.

■ 1. We consider first the applicability of the continuing contract protections of Minn.St. 125.12, subd. 4 [3] to eleventh-month contract provisions.

The trial court recognized that there could be little dispute that the 11-month employment term had been incorporated into prior contracts between these affected teachers and the School District. The evidence consisted of the contracts themselves and the interpretive reports, guides, handbooks, and other documents.[4] The remaining question, however, is whether the duration of employment responsibilities, consistently extended by contract to 11 months in prior years, had thereby been incorporated into the "continuing contract" between the teachers and the School District so that termination by the District of the eleventh month would invoke the notice, hearing, and recall protections of Minn.St. 125.12, subd. 4.

The trial court concluded that no such protection was applicable:

"It is the determination of this Court that the teaching assignment or 'position which entitles the teacher to protection under the continuing contract law as set forth in Minnesota Statute 125.14 [125.-12], is that assignment that is performed during the 'normal school year.' That normal school year is for the purposes of this statute in 125 to be treated as the school year that meets the requirements of the State Statute elsewhere, if any, and which normally runs from late August or early September on until late May or early June. In other words, so long as the School District discharges its duties in educating its students during the 'normal school year' (which runs in most school

**3.** Minn.St. 125.12, subd. 4, provides: "A teacher who has completed his [two-year] probationary period in any school district * * * shall have a continuing contract with such district. Thereafter, the teacher's contract shall remain in full force and effect, except as modified by mutual consent of the board and the teacher, until terminated by a majority roll call vote of the full membership of the board * * * upon one of the grounds specified in subdivision 6 [grounds for termination] * * * or * * * 6a [negotiated unrequested leave of absence] or 6b [unrequested leave of absence], * * *. Before a teacher's contract is terminated by the board, the board shall notify the teacher in writing and state its ground for the proposed termination in reasonable detail together with a statement that the teacher may make a written request for a hearing before the board within 14 days after receipt of such notification. Within 14 days after receipt of this notification the teacher may make a written request for a hearing before the board and it shall be granted before final action is taken. If no hearing is requested within such period, it shall be deemed acquiescence by the teacher to the board's action. Such termination shall take effect at the close of the school year in which the contract is terminated in the manner aforesaid. Such contract may be terminated at any time by mutual consent of the board and the teacher and this section shall not affect the powers of a board to suspend, discharge, or demote a teacher under and pursuant to other provisions of law."

**4.** Respondent School District pointed out that much of the contract interpretive material was prepared for the School Board rather than on its behalf. This material shows the agreed understanding of the parties at the time, however. Until the January 1972 resolution there is nothing to indicate that the Board objected to characterizing the agreements as "eleven-month contracts."

districts from around Labor Day to around Memorial Day), then the continuing contract rights or teacher tenure rights as set forth in Minn.Stat. 125.12 relates to the teacher contract rights and duties for that essential 10 month period and does not extend into the so-called 11th month traditionally associated with a summer session."

We disagree. We have not been referred to anything in the language of the continuing contract law or its accompanying legislative history which suggests that its application is limited to a "normal" or "essential" school year. On the contrary, prior interpretations have recognized that, for purposes of "continuing contract" guarantees, a single annual employment contract is anticipated. *Poirier v. Independent Sch. Dist. No. 191,* Minn., 255 N.W.2d 400 (1977); Op.A.G. No. 172–C–5 (November 29, 1972).

Minn.St. § 125.12, subd. 2, sets forth the specific requirements for hiring teachers. Employment is to be by a written contract which specifies "the wages per year and the general assignment of the teacher."

Minn.St. § 125.12, subd. 3, sets out a "probationary period," during which an "annual contract with any teacher may or may not be renewed as the school board shall see fit . . . ." Minn.St. 125.12, subd. 4, provides that after completion of the probationary period, a teacher is deemed to have a "continuing contract" of employment, which may only be modified by mutual consent of the teacher and the district, terminated by a teacher's unilateral resignation, or terminated unilaterally by the school board in compliance with certain specified procedures and upon certain specific grounds.

Reading Minn.St. § 125.12, subds. 2 and 4 together, it seems clear that a teacher's "continuing contract" is the written contract which is originally executed in compliance with Minn.St. § 125.12, subd. 2, as modified in compliance with the statute. After a teacher acquires tenure, the general assignment and basic salary specified in the contract remain in effect until modified according to law. The period of service of a teacher's general assignment becomes, by implication, a part of the continuing contract. Thus, in *Poirier,* where an annual continuing contract specifically limiting service to one-quarter of the year, was modified by mutual consent to require the teacher to serve a second quarter of that year, "it would be required that the period of service (of his employment) be for a minimum of two quarters rather than one." 255 N.W.2d at 404.

■ The School District places broad reliance on *Stang v. Independent School Dist. No. 191,* Minn., 256 N.W.2d 82 (1977), and *Chiodo v. Board of Education of Special School Dist. No. 1,* 298 Minn. 380, 215 N.W.2d 806 (1974). Both cases denied continuing contract protection to the school coaching assignments of regularly-employed social science teachers. Neither decision, however, purported to define the scope of employment responsibilities entitled to continuing contract protection. Rather, both decisions bifurcated the teachers' contracts between regular and "extra duty" assignments and held that the position of "coach" was not within the applicable statutory definition of "teacher" entitled to protection.[5] Here, by contrast, the teachers' contracts, contract revision forms, and salary worksheets clearly distinguished contract length from "extra duty" assignments. Nowhere is the eleventh month characterized as an extra duty assignment; nowhere is the 11-month "base" or "basic" salary segregated into normal and "extra duty" pay, even though the School Board prepared the forms and specifically provided space for indicating extra duty pay and assignments. *Chiodo* and *Stang* do not control this case. Since 1956, School District summer assignments have been predominantly education-oriented, involving or closely associated with familiar classroom teaching assignments. We need not exam-

5. *Chiodo* involved a non-first-class city, and so applied the statutory definition of teacher in Minn.St. 125.12, subd. 1. *Stang* used the definition applicable to first class cities, Minn.St. 125.17, subd. 1(a).

ine individual assignment records in this regard, however. The contracts obligated the teachers to continued professional duty; the precise assignments were the responsibility of respondent School District.[6]

Our application of continuing contract protections to extended term teaching contracts is consistent with the fundamental purpose of the teacher tenure law, protection against summary administrative termination. *Hudson v. Independent Sch. Dist. No. 77*, Minn., 258 N.W.2d 594, 597 (1977). While reasonable restrictions should not be placed on the powers which a school district must possess to effectively administer operation of public schools, we do not believe that flexibility will be limited by requiring the district to comply with statutory procedures in reducing the salaries and periods of service which are specified in continuing contracts. Accordingly, we reverse the trial court's judgment on this issue.

 2. We next address the issue of the sufficiency of salary review worksheets which incorporate biennial master contracts as annual contract documentation under Minn.St. § 125.12, subd. 2.

> Minn.St. 125.12, subd. 2, requires that: " * * * The employment shall be by written contract, signed by the teacher and by the chairman [of the school board] and clerk [of the school district]. Contracts for teaching or supervision of teaching can be made only with qualified teachers. Such contract shall specify the wages per year and the general assignment of the teacher. * * * "

The original contracts of employment between individual teachers and the School District satisfy the requirements of Minn.St. 125.12, subd. 2. They are in writ-

ing, set forth the salary and several assignments of the teacher, and are signed by the teacher and the chairman and clerk of the School Board. As renewed annually, each contract is modified according to a salary schedule negotiated by the teachers' bargaining representative and the School Board in the Master Contract and is approved as modified by each teacher in writing in the form of the salary worksheet. We affirm the trial court's finding of statutory compliance.

Reversed in part, affirmed in part.

---

6. The acceptance of "non-teaching" summer assignments did not constitute a waiver of pre-existing tenure rights. *Board of Education v. Sand*, 227 Minn. 202, 34 N.W.2d 689 (1948).

Similarly, the modification clause found in several of the teachers' initial employment contracts, permitting the School District to unilaterally reduce salaries and assignments, was not effective. Contractual waiver of *statutory* tenure rights must be knowing and voluntary, *State ex rel. Johnson v. Independent School Dist. No. 810*, 260 Minn. 237, 109 N.W.2d 596 (1961), and will not be upheld where the teacher had no choice in contract terms. *Perry v. Independent School Dist. No. 696*, 297 Minn. 197, 210 N.W.2d 283 (1973). The district court expressly found that "[n]one of the plaintiff teachers at any time voluntarily or knowingly agreed or otherwise waived the continuing contract protections provided by Minn.St. 125.12 * * *."